UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
AT LEXINGTON

| | |
|---|---|
| SCOTT BISHOP | CIVIL ACTION NO. 5:15-cv-104-KKC |
|     Plaintiff, | |
| V. | OPINION AND ORDER |
| AETNA LIFE INSURANCE COMPANY, | |
|     Defendant. | |

*** *** ***

Plaintiff Scott Bishop ("Mr. Bishop") filed this action pursuant to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), alleging that Defendant Aetna Life Insurance Company ("Aetna") wrongfully terminated his long-term disability benefits. For the reasons stated herein, the Court finds that Aetna's decision to terminate benefits was arbitrary and capricious, and is reversed and remanded for further consideration consistent with the reasoning of this opinion.

## I.    BACKGROUND

For approximately fourteen years, Mr. Bishop was an employee of Wausau Paper Corporation ("Wausau") in Harrodsburg, Kentucky, where he worked as a converting machine operator. [DE 14-1 at 1.] Mr. Bishop purchased long-term disability insurance from Aetna, which was offered as part of his employment. [DE 14-1 at 1.] Mr. Bishop alleges that he has been unable to work since February 28, 2012, due to "diffuse osteoarthritis and swelling in his joints, gout, and degenerative joint disease in his left knee." [DE 14-1 at 1.]

Due to his physical condition, Mr. Bishop applied for social security disability benefits ("SSD benefits") as well as long-term disability benefits ("LTD benefits") through Aetna. [DE 14-1 at 3; DE 15 at 6.] As part of his claim, the Social Security Administration ("SSA") asked that Mr. Bishop be examined by Dr. David Winkle ("Dr. Winkle"). [DE 14-1 at 3; DE 15 at 6.] On February 11, 2013, Dr. Winkle examined Mr. Bishop and authored a report that is contained in the Administrative Record. [AR 607-612.]

On January 21, 2014, Aetna initially determined that Mr. Bishop was not entitled to any LTD benefits due to a lack of required paperwork. [DE 15 at 7.] Shortly thereafter, Mr. Bishop appealed that original determination and provided additional evidence in support of his claim. [DE 14-1 at 4; DE 15 at 8.] In addition, Aetna requested that Dr. Tracey Schmidt ("Dr. Schmidt") conduct a paper review of Mr. Bishop's file. [DE 14-1 at 4; DE 15 at 8.] Dr. Schmidt's report is also contained in the Administrative Record. [DE 521-52.] Mr. Bishop's attorney requested that Aetna postpone its decision until after Mr. Bishop's upcoming hearing with the SSA. [DE 15 at 8.]

On May 8, 2014, Mr. Bishop participated in an SSA hearing regarding his SSD benefits claim. [DE 14-1 at 5.] Joyce Forest, a vocational expert, also testified at the SSA hearing. [DE 14-1 at 6; AR 488.]   The SSA found that Mr. Bishop "has the residual functional capacity to perform sedentary work," but stated a number of other restrictions on that ability, including that he would routinely miss three or more days of work per month due to his health problems. [AR 485.] The SSA concluded that "there are no jobs that exist in significant number in the national economy that the claimant can perform" and that Mr. Bishop was disabled under SSA standards. [DE 487.] Therefore, Mr. Bishop was awarded SSD benefits.

On July 23, 2014, Aetna overturned its initial decision and found that Mr. Bishop, at that point in time, met the LTD Plan's definition of disability because he was unable to

perform his former job at Wausau. [DE 15 at 9.] Importantly, the LTD Plan Test of Disability uses a different definition of disabled after 24 months. During the first 24 months, a claimant is disabled under the LTD Plan if he is unable to perform his own occupation. [DE 15 at 10.] Thus, Aetna found Mr. Bishop was disabled within the meaning of the Plan during the first 24 months because he could not perform his "own occupation" at Wausau and paid him LTD benefits. The LTD Plan terms permit Aetna to reduce its LTD benefits payments by the amount of SSD benefits a claimant receives. [DE 14-1 at 7.] Accordingly, Aetna reduced Mr. Bishop's LTD benefits by the full amount of his SSD benefits. [AR 262-263.]

After the first 24 months, a claimant is only disabled if he is "unable to work at any reasonable occupation." [DE 15 at 10.] In the Plan, "reasonable occupation" is defined as "any gainful activity for which you are, or may reasonably become, fitted by education, training, or experience" and which "results in, or can be expected to result in, an income of more than 60% of [the claimant's] adjusted predisability earnings." [DE 15 at 10.]

On August 28, 2014, Aetna sent Mr. Bishop a letter (the "August 28 Letter") informing him that his LTD benefits were being terminated. [AR 282-285.] As part of its claim analysis, Aetna ordered a vocational assessment, which was performed by Diane Winiarski, [AR 116-119], and produced a Seeker Report. [AR 283; 460-461.] Aetna cited the Seeker Report in its August 28 Letter, and concluded the following: "In view of the above, Aetna is terminating your claim for disability benefits effective 08/31/2014, on the basis that you are not disabled from performing any reasonable occupation for which you are qualified by education, training or experience." [AR 284.]

Mr. Bishop then appealed Aetna's termination of his benefits. [DE 14-1 at 10; DE 15 at 12.] In support of his administrative appeal, Mr. Bishop provided a vocational report from Dr. Stephanie Barnes ("Dr. Barnes"), a vocational consultant. [AR 402-408.] Aetna

3

ordered a second review of Mr. Bishop's medical records, which was completed by Dr. Timothy Craven ("Dr. Craven"). [AR 359-363.] Aetna also ordered a second vocational analysis, which was performed by Kristen Hamilton ("Ms. Hamilton"), a Vocational Manager and Disability Specialist. [AR 350-56.] On March 27, 2015, Aetna sent Mr. Bishop another letter (the "March 27 Letter"), which cited Ms. Hamilton's report and informed Mr. Bishop that Aetna was affirming its termination of benefits. [AR 186-188.]

Finally, with his administrative remedies exhausted, Mr. Bishop appealed Aetna's decision to this Court pursuant to 29 U.S.C. § 1132(a)(1)(B).

## II.   STANDARD OF REVIEW

The parties stipulated that the arbitrary and capricious standard of review applies. [DE 11.] This standard is the "least demanding form of judicial review." *Perry v. United Food and Commercial Workers Dist. Unions 405 and 442,* 64 F.3d 238, 242 (6th Cir. 1995). "Despite this deferential standard, however, [a court's] review is no mere formality." *Glenn v. MetLife*, 461 F.3d 660, 666 (2006). "[T]he federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions." *Moon v. Unum Provident Corp.,* 405 F.3d 373, 379 (6th Cir. 2005). A plan administrator's decision will be upheld "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Baker v. United Mine Workers of America Health and Retirement Fund*, 929 F.2d 1140, 1144 (6th Cir. 1991).

Moreover, courts must "take into account the existence of a conflict of interest that results when, as in this case, the plan administrator who decides whether an employee is eligible for benefits is also obliged to pay those benefits" to the claimant. *Glenn*, 461 F.3d at 666. Here, Aetna is both authorized to decide whether Mr. Bishop is eligible for benefits and obliged to pay him those benefits if he is found to be disabled. Aetna's "dual function

creates an apparent conflict of interest" that this Court must appropriately consider *Id*. In fact, in *Glenn* the Sixth Circuit reversed a district court's decision in part because the lower court failed to give sufficient weight to an inherent conflict of interest. *Id*.

## III.    ANALYSIS

### (1) Consideration of the SSA Determination

Mr. Bishop first argues that Aetna's decision was arbitrary and capricious because it "gave no real explanation of why its termination of benefits differed from the SSA's decision," but only "vaguely stated that the standard for [SSD benefits] is different from the Aetna plan." [DE 14-1 at 15.] This argument standing alone is insufficient to render Aetna's decision arbitrary and capricious, but the deficiencies in the explanation Aetna provided to Mr. Bishop about why its determination differed from the SSA's determination factor heavily in this Court's review.

A determination that a person meets the Social Security Administration's uniform standards for disability benefits does not make him automatically entitled to benefits under an ERISA plan, since the plan's disability criteria may differ from the Social Security Administration's. *Whitaker v. Hartford,* 404 F.3d 947, 949 (6th Cir.2005). However, the Sixth Circuit has stated that:

> [I]f the plan administrator (1) encourages the applicant to apply for Social Security disability payments; (2) financially benefits from the applicant's receipt of Social Security; and then (3) fails to explain why it is taking a position different from the SSA on the question of disability, the reviewing court should weigh this in favor of a finding that the decision was arbitrary or capricious.

*Bennett v. Kemper Nat. Servs., Inc.*, 514 F.3d 547, 554 (6th Cir. 2008). In *Glenn v. MetLife*, 461 F.3d 660 (6th Cir. 2006), the Court stated that a plan administrator's failure to consider the SSA's finding of disability in reaching its own determination is a significant factor that district courts should consider. *Id.* at 669. In *Glenn*, the plan administrator

denied LTD benefits, but the Court noted that "[n]owhere in the notice of denial does the plan administrator mention the decision of the [SSA] finding that Glenn was totally disabled." *Id.* at 670. This failure by the plan administrator contributed to the Court's finding that the administrator's decision to deny benefits was not the product of a principled and deliberative reasoning process. *Id.* at 674.

In the present case, Aetna encouraged Mr. Bishop to apply for SSD benefits and then deducted the amount of those benefits from the LTD benefits it paid to Mr. Bishop in the first 24 months. Therefore, the first and second prongs identified by the Sixth Circuit are met here: Aetna encouraged Mr. Bishop to apply for SSD benefits then financially benefitted from Mr. Bishop's receipt of those benefits. *Bennett*, 514 F.3d at 554. The question is whether Aetna failed to adequately explain why its position was different from the SSA's position. *Id.* Aetna maintains that it provided a satisfactory explanation in its termination letters. [DE 15 at 22-25.]

On its face, this case is distinguished from the cases cited by Mr. Bishop, including *Glenn* and *Bennett*, as well as *DeLisle v. Sun Life Assur. Co. of* Canada, 558 F.3d 440 (6th Cir. 2009); Montour *v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623 (9th Cir. 2009); *Homstrom v. Metro. Life Ins. Co.*, 615 F.3d 758 (7th Cir. 2010); *Raybourne v. Cigna Life Ins. Co.,* 700 F.3d 1076 (7th Cir. 2012); *Melech v. Life Ins. Co. of N. Am.*, 739 F.3d 663 (11th Cir. 2014). In those cases, each plan administrator completely failed to address the SSA's contrary determination in their denial notification. The present case is factually distinguished from those cases because Aetna clearly did at least address the SSA's determination in the August 28 Letter. [AR 283] ("We understand that you have recently been approved for Social Security Disability (SSD) benefits."). Yet, in *Glenn* the Sixth Circuit stated that merely mentioning a piece of evidence is not equivalent to actually

discussing or explaining it. 461 F.3d at 671, n.3. Therefore, the Court must evaluate the explanation that Aetna gave Mr. Bishop when it terminated his LTD benefits.

In the August 28 Letter, Aetna included three paragraphs regarding the SSA's determination. The first paragraph is merely a generalized discussion stating that SSD benefits determinations and LTD benefits determinations are not always the same due to differences between SSA regulations and the provisions contained in LTD policies. [AR 283]. Aetna stated that "SSA regulations require that certain disease/diagnoses or certain education or age levels be given heavier or even controlling weight in determining whether an individual is entitled to SSD benefits." [AR 283.] However, these hypothetical reasons for potentially different determinations did not apply to Mr. Bishop. He did not have a particular disease or diagnosis that was given more weight, nor was he at an age level that would facilitate approval of his SSA claim. *See* [AR 482-489, SSA Decision.] Such a generalized explanation that is wholly inapplicable to the claimant is insufficient. If Aetna had ended its discussion of the SSA determination with this single paragraph, it would have clearly indicated that Aetna did not properly consider the SSA's findings.

But Aetna continued its discussion of the SSA's determination in the following paragraphs. Aetna begins the second paragraph by stating, "According to the Administrative Law Judge's 06/02/14 written decision, SSA also finds that you are capable of sedentary work." [AR 283.] The remainder of the second paragraph describes the SSA's determination that Mr. Bishop was entitled to SSD benefits. The second paragraph therefore indicates that Aetna at least addressed the SSA's determination in Mr. Bishop's case.

The third paragraph dealing with the SSA's determination attempts to explain why Aetna's decision is different than the SSA's decision. It is helpful to recite this paragraph in full:

7

> As previously stated, the LTD plan requires that Aetna consider if you are able to perform the duties of any reasonable occupation for which you are fitted by education, training or experience and which results in an income of more than 60% of your adjusted predisability earnings. As indicated above, Aetna's vocational consultant has identified viable, alternative occupations within the plan's definition of reasonable occupation. As a result, even though you are receiving SSD benefits, we are unable to give it significant weight in our determination and we find that you are no longer eligible for LTD benefits based on this plan's Test of Disability documented above.

[AR 283.] This paragraph, when read in conjunction with the prior two paragraphs, seemingly provides a plausible explanation for why Aetna reached a different conclusion than the SSA: the LTD Plan's Test of Disability and definition of "reasonable occupation" differs from the applicable SSA definition. Indeed, the LTD Plan defines "reasonable occupation" as "any gainful activity for which you are, or may reasonably become, fitted by education, training, or experience." [AR 83.] In its Response, Aetna relies heavily on this difference in definitions, stating:

> Unlike the SSA definition of disability which limits the determination to a claimant's ability to perform any gainful work based on the claimant's *current* age, education, and experience, the Plan's definition of disability (which incorporates the definition of reasonable occupation) is broader and includes any gainful activity that the claimant **may become fitted** to **with additional** education, training, or experience, even if the claimant is not currently able to perform that type of work.

[DE 15 at 25.] (emphasis in original). The "or may reasonably become" language in the LTD plan definition is a viable explanation for why Aetna terminated Mr. Bishop's LTD benefits even though he received SSD benefits, as the LTD Plan definition accounts for possible future training and thereby captures a wider range of potential jobs for the claimant, whereas the SSA definition does not. In other words, the "or may reasonably

8

become" language makes it more difficult to meet the LTD Plan's Test of Disability and explains why Mr. Bishop could qualify for SSD benefits but not LTD benefits.

If Aetna truly relied on this explanation at the time it terminated Mr. Bishop's benefits, then Aetna adequately distinguished the SSA's determination. However, Mr. Bishop asserts that Aetna did not actually rely on the difference in definitions when it terminated his LTD benefits. Rather, he argues that Aetna's justification based on the "or may reasonably become" language was offered for the first time in its Response brief. [DE 16 at 9-10.] He states that this explanation was never disclosed to him when his benefits were terminated and urges the Court not to consider it.

Mr. Bishop is correct that the August 28 Letter did not specifically state that Aetna was relying on the "or may reasonably become" language to distinguish the SSA's determination. In fact, in the third paragraph, which is stated above in full, Aetna actually *omitted* the "or may reasonably become" language when it stated the LTD plan definition in an effort to explain how the plan definition differed from the SSA's definition. [AR 283] ("the LTD plan requires that Aetna consider if you are able to perform the duties of any reasonable occupation for which you are fitted by education, training, or experience. . ."). That omission suggests that at the time it terminated Mr. Bishop's benefits, Aetna was not actually relying upon the "or my reasonably become" piece of the definition to distinguish the SSA determination. Rather, it is likely that Aetna's attorneys, not its LTD claims analyst, generated the argument in defense of Aetna's denial. Stated alternatively, if Aetna was truly relying upon the "or may reasonably become" part of the definition at the time it terminated Mr. Bishop's benefits, it is highly unlikely that Aetna would have failed to emphasize that piece of the definition, much less omit it entirely, when explaining to Mr. Bishop why its determination differed from the SSA's determination.

As Mr. Bishop points out, the way that Aetna stated the LTD plan definition in the third paragraph, with the "or may reasonably become" language conspicuously absent, would actually make it easier, not more difficult, to meet the Test of Disability in the plan definition because of the 60% earnings requirement. This means that if Aetna was not actually relying on the "or may reasonably become" part of the definition when it terminated Mr. Bishop's benefits, the rationale it stated in the August 28 Letter for distinguishing the SSA determination is illogical.

Courts strongly disfavor post hoc rationales that are not explicitly stated by the plan administrator in the denial notice, but generated after the fact during the course of litigation. In *Univ. Hosps. v. Emerson Elec.* Co, the Sixth Circuit explained why post hoc justifications should be rejected:

> [I]t strikes us as problematic to, on one hand, recognize an administrator's discretion to interpret a plan by applying a deferential "arbitrary and capricious" standard of review, yet, on the other hand, allow the administrator to "shore up" a decision after-the-fact by testifying as to the "true" basis for the decision after the matter is in litigation, possible deficiencies in the decision are identified, and an attorney is consulted to defend the decision by developing creative post hoc arguments that can survive deferential review. The concerns inherent in this scenario are even more pronounced where, as here, the administrator has a financial incentive to deny benefits. To depart from the administrative record in this fashion would, in our view, invite more terse and conclusory decisions from plan administrators, leaving room for them—or, worse yet, federal judges—to brainstorm and invent various proposed "rational bases" when their decisions are challenged in ensuing litigation.

202 F.3d 839, 849 n.7 (6th Cir. 2000); *see also McCandless v. Standard Ins. Co.*, No. 2:08-CV-14195, 2014 WL 4681480, at *3 (E.D. Mich. Sept. 19, 2014); *Roubal v. Prudential Ins. Co. of Am.*, No. 3:08-CV-10-H, 2009 WL 2487978, at *4 (W.D. Ky. Aug. 14, 2009) ("courts should not defer to post hoc rationale and the laws for denying benefit claims generated for purposes of litigation by plan administrators when those rationales did not

10

appear in the denial letters or in the administrative record."). At the very least, this Court is skeptical whether Aetna actually relied on the "may reasonably become" language when it terminated Mr. Bishop's benefits. This calls into question whether Aetna adequately considered the SSA's determination, or merely paid it lip service.

The Court is reluctant to approve of Aetna's analysis of the SSA determination in this case because it could set an unfavorable precedent for future cases. Allowing a plan administrator to mention that it recognizes that a claimant received SSD benefits but that it is "unable to give it significant weight," [AR 283.], without providing a complete, accurate justification in the termination notice might encourage plan administrators to simply reference SSA determinations without actually considering them. Thus, outright approval of Aetna's questionable analysis would signal to plan administrators that they can dismiss SSA determinations using, as the Sixth Circuit put it, "terse and conclusory" explanations. *Emerson*, 202 F.3d at 849 n.7

It is of course possible that Aetna inadvertently omitted the "or may reasonably become" language from the August 28 Letter. Even so, Aetna's failure to fully identify grounds for termination of its benefits affects a beneficiary's grounds for appeal. Accordingly, Aetna's material omission deprived Mr. Bishop of the opportunity to offer evidence of why he was unable to "reasonably become" fitted for a job with additional training or education.

Lastly, the March 27 Letter denying Mr. Bishop's appeal contains only the single paragraph providing the generalized explanation of why LTD benefits and SSD benefits determinations might differ. [AR 187.] That paragraph is nearly identical in both letters, suggesting it was drawn from a generic template. Aetna completely omitted any specific discussion of the SSA's determination in Mr. Bishop's case.  As explained above, this Court

11

views that generalized paragraph standing alone, which does not apply to Mr. Bishop's case whatsoever, as indicative of an insufficient consideration of the SSA's determination.

While the "or may reasonably become" language in the LTD Plan definition is a plausible explanation for distinguishing Aetna's determination from the SSA's determination, the fact that the language was not included in the letter leads the Court to question whether Aetna's decision was part of a principled reasoning process. Regardless, Aetna's failure to fully notify Mr. Bishop of the grounds for its decision hampered his appeal of the termination. This deficiency does not make Aetna's decision arbitrary and capricious in and of itself, but it is certainly a factor that colors the remainder of the Court's analysis. *See Glenn*, 461 F.3d at 696 ("That MetLife apparently failed to consider the Social Security Administration's finding of disability in reaching its own determination of disability does not render the decision arbitrary *per se*, but it is obviously a significant factor to be considered upon review.").

### (2) Reliance on the "Potential" Jobs Identified in the Seeker Report

Next, Mr. Bishop attacks Aetna's reliance on the "potential" jobs identified in the Seeker Report when it terminated his benefits. [DE 14-1 at 19-20.] The Court finds that Aetna mischaracterized the results of the Seeker Report in the August 28 Letter. Therefore, Aetna's termination of Mr. Bishop's benefits was not based on substantial evidence.

The Seeker Report, the first vocational assessment conducted by Aetna, identified four possible jobs that Mr. Bishop could perform. [AR 461.] The Seeker Report itself classifies these jobs as "potential" matches for Mr. Bishop. The Report defines a "potential" match as requiring additional training in tools and materials. Thus, the Seeker Report undeniably indicates that Mr. Bishop required additional training to obtain the four listed jobs.

Aetna cited these four jobs in its August 28 Letter. Aetna stated "[i]t was determined that you <u>have</u> the skills to perform the following sedentary occupations," then listed the four jobs from the Seeker Report. [AR 283.] (emphasis added). This statement is clearly inconsistent with the Seeker Report. Aetna cited the four jobs as occupations for which Mr. Bishop presently possessed all necessary skills. The Report did not state that Mr. Bishop possessed the skills to perform the listed occupations. Rather, the report clearly indicates that Mr. Bishop would require additional training in tools and materials in order to perform those jobs. Accordingly, Aetna's assertion to Mr. Bishop that "you have the skills" to perform the four listed occupations was unsupported by substantial evidence.

Aetna based its decision to terminate Mr. Bishop's benefits on that flawed premise. [AR 284] ("In view of the above, Aetna is terminating your claim for disability benefits effective 08/31/2014, on the basis that you are not disabled from performing any reasonable occupation *for which you are qualified by education, training, or experience*.") (emphasis added). Again, the Seeker Report did not say that Mr. Bishop was qualified, but that he required additional training.

Despite the terms of the LTD Plan allowing Aetna to consider whether Mr. Bishop could "reasonably become" qualified for the four jobs listed in the Seeker Report by completing additional training, Aetna apparently failed to do so. In its Response, Aetna seems to assume that any required training in tools and materials would be reasonable. *See* [DE 15 at 28] ("Plaintiff takes issue with Aetna's reliance on the vocational assessments that identified other occupations that Plaintiff was fitted for or that Plaintiff may reasonably become fitted by education, training, or experience."). However, the Seeker Report does not state whether the training would be minimal or extensive, or what such training would entail, and this Court is not equipped to determine whether a person with Mr. Bishop's physical limitations could reasonably complete any required training. At no

13

point did Aetna actually analyze whether it would be reasonable for Mr. Bishop to train in tools and materials. *See Gully v. Aetna Life Ins. Co.,* 997 F. Supp. 2d 955, 963 (W.D. Ark. 2014) ("The problem with Aetna's position is that it improperly assumes any necessary training will be 'minimal,' even though [Aetna's vocational expert] fails to specifically … assess the level of training that would be required."). Instead, Aetna erroneously stated that Mr. Bishop was qualified for the four jobs. Since the stated basis for Aetna's termination was unsupported by substantial evidence, the Court cannot conclude that Aetna performed a reasoned review of Mr. Bishop's claim.

In addition, the fact that Aetna failed to account for future training when citing the Seeker Report further suggests that it did not actually rely on the forward-looking "or may reasonably become" language to distinguish the SSA's determination. This reinforces the concerns stated in Section 1.

### (3) Dr. Craven's Report

Mr. Bishop next argues that "Aetna's reliance on Dr. Craven, given his failure to analyze or even mention some of the critical components of Bishop's claim, is not part of a principled reasoning process." [DE 14-1 at 22.] This argument is unconvincing. Dr. Craven's report suggests that he reviewed all of the pertinent records when conducting his analysis, including the evidence submitted by Mr. Bishop, and reached a rational conclusion.

The fact that Dr. Craven conducted a paper review rather than an in-person examination does not affect the credibility of his findings. *Calvert v. Firstar Finance, Inc.,* 409 F.3d 286, 296 (6th Cir. 2005) ("we find nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination."). Dr. Craven's report lists two physician reviews by Dr. Schmidt in the "records submitted for review" section and certifies that Dr. Craven considered them. [AR 359-360] ("I have reviewed all of the records listed above … I reviewed 189 pages of medical records."). Dr. Craven discussed

14

Dr. Winkle's evaluation and stated that he "reviewed [Mr. Bishop's] application and paperwork for Social Security disability." [AR 361.] Dr. Craven even specifically stated that he reviewed Dr. Barnes's report, which was submitted by Mr. Bishop. [AR 362.] Contrary to Mr. Bishop's argument, the record does not show that Dr. Craven failed to analyze critical components of his file.

Dr. Craven's report is distinguished from the reports in the cases relied on by Mr. Bishop. Unlike in *Calvert v. Firstar Finance, Inc.,* 409 F.3d 286 (6th Cir. 2005), in which the Court found a doctor's paper review was "clearly inadequate" because the doctor plainly failed to review the claimant's entire file and made conclusions that were "incredible on their face," Dr. Craven's report indicates he gave due consideration to the records in Mr. Bishop's file and came to a reasonable conclusion. In *Kalish v. Liberty Mut./Liberty Life Assur. Co. of Boston*, 419 F.3d 501 (6th Cir. 2005), the Court found that a paper review was inadequate because it contained a blatant inconsistency: it stated that the claimant could perform his job, which was described as "high stress with many deadlines," but failed to consider that the claimant's condition resulted in an increased risk of heart failure. This Court cannot find any such glaring errors in Dr. Craven's analysis. Dr. Craven appears to have thoroughly considered Mr. Bishop's ailments and limitations as described in the records he reviewed. His diagnosis of Mr. Bishop's impairments tracks that of the other doctors who examined Mr. Bishop, [AR 362], and his conclusion that Mr. Bishop is able to perform sedentary work, [AR 363], is consistent with the SSA's finding that he has the "residual functional capacity to perform sedentary work." [AR485.] Thus, Dr. Craven's report itself shows no major flaws.

15

### (4) Ms. Hamilton's Vocational Report

Finally, Mr. Bishop challenges Ms. Hamilton's vocational report. The Court finds serious defects in Ms. Hamilton's vocational analysis.

First and most importantly, Ms. Hamilton did not have Mr. Bishop's complete file when she conducted her vocational analysis. Courts are hostile towards vocational reports that are conducted without all of the claimant's records. "A vocational expert's opinion that a claimant can perform certain jobs is only substantial evidence to the extent that the vocational expert had a complete, accurate understanding of the claimant's restrictions and limitations." *Neaton v. Hartford Life & Acc. Ins. Co.*, 517 F. App'x 475, 485 (6th Cir. 2013). In affirming the Sixth Circuit's decision in *Glenn*, the Supreme Court stated that the plan administrator's "fail[ure] to provide its independent vocational and medical experts with all of the relevant evidence" was a "serious concern" that supported overturning the plan administrator's decision. *Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 118 (2008). Furthermore, in *Benningfield v. Hartford Life & Acc. Ins. Co.,* No. 4:11CV-00087-JHM, 2012 WL 2368165, at *6 (W.D. Ky. June 21, 2012), a district court in the Western District of Kentucky held that a denial of LTD benefits based on an [Employability Analysis Report] that did not contain all relevant medical information and included abilities that neither the claimant or his employer indicated he specifically possessed showed that the plan administrator did not perform a reasoned review of the claim. These cases illustrate that a vocational expert must be given a complete understanding of the claimant's condition in order to conduct a reliable analysis.

Here, the only medical documentation that Aetna provided to Ms. Hamilton was Dr. Craven's report. [AR 250] Ms. Hamilton did not have Dr. Winkle's report or Dr. Schmidt's report. While the Court is satisfied that Dr. Craven adequately considered the reports of Dr. Winkle and Dr. Schmidt, his report is not a substitute for their entire reports. Most

16

notably, Dr. Craven's report does not specifically mention that Mr. Bishop may be forced to miss days of work due to his health problems, whereas Dr. Schmidt's report states that "[t]he claimant may need days off for a gouty arthritis flare" [AR 527] and Dr. Winkle's report notes that Mr. Bishop "has a flare up of gout about every 6 months." [AR 490]. The SSA determination also stated that Mr. Bishop "will routine [sic] miss three or more days of work per month due to problems with his health," [AR 485], but Ms. Hamilton was not given the SSA's written decision either. Ms. Hamilton's report contains no mention of Mr. Bishop's possible absenteeism or recurring gout flare ups, likely because Dr. Craven did not mention them in his report. In fact, Ms. Hamilton simply recited Dr. Craven's brief conclusion in the "functional capacities/ restrictions" section of her report. [AR 351.] Recurring absenteeism is undoubtedly a major consideration in determining whether a person can acquire a job, but it was not included Ms. Hamilton's analysis. Thus, at least one major piece of information was missing from Ms. Hamilton's analysis because Aetna provided her with an incomplete record.

Similarly, the only vocational information Aetna provided was its own prior Seeker Report. Aetna did not provide Ms. Hamilton with the SSA's determination containing the vocational opinion of Joyce Forest [AR 510] or Dr. Barnes's vocational report [AR 402-408], both of which found that there were no jobs that Mr. Bishop could perform. It is troubling that Aetna was selective in the records it provided Ms. Hamilton. Dr. Craven's report and the Seeker Report both indicated that Mr. Bishop would be able to find work. Aetna did not provide Ms. Hamilton with any of the evidence from the administrative record that concluded otherwise, strongly suggesting that Aetna wanted Ms. Hamilton's vocational report to find that occupations were available for Mr. Bishop. Especially when coupled with the inherent conflict of interest that gave Aetna "a clear incentive to contract with individuals who [are] inclined to find in its favor," *Calvert*, 409 F.3d at 286, Aetna acted

17

unreasonably by commissioning a result-oriented vocational report based on limited records. A vocational analysis based on such a small, self-serving portion of the claimant's records is not reliable evidence.

Furthermore, Mr. Bishop is adamant that Ms. Hamilton's report itself was flawed in several respects. [AR 12-13; 23.] First, in spite of the fact that his job description did not mention computer skills, Ms. Hamilton stated that Mr. Bishop's position at Wausau "likely required the use of several computer systems" and therefore "inferred" that Mr. Bishop had basic computer skills. [AR 351.] It is undisputed that Mr. Bishop did not use a computer in his prior job, making her inference totally inaccurate. Aetna argues that Ms. Hamilton's assumption was harmless because none of the jobs she identified required computer skills. [DE 15 at 32.] Even taking that as true, Ms. Hamilton's clearly inaccurate assumption undermines the credibility of her other findings.

For instance, Ms. Hamilton found that Mr. Bishop's job at Wausau was most similar to a position in the Dictionary of Occupational Titles with a specific vocational preparation rating (SVP) of 7, [AR 351], whereas Ms. Winiarski, Aetna's other vocational expert who prepared the Seeker Report, stated that Mr. Bishop's job had an SVP of only 4. [AR 118.][1] This difference is significant, as an SVP of 7 means that an employee requires "over 2 years and up to and including 4 years" of experience to perform a job, whereas a job with an SVP of 3 requires only one to three months of experience to perform.[2] While it is not unreasonable for vocational experts to classify a person's job in different ways, neither Ms. Hamilton nor Aetna ever explained the vast difference of opinion. Given Ms. Hamilton's erroneous belief that Mr. Bishop's prior job required computer skills, it is not a stretch to

---

[1] SVP is defined as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Curtis v. Hartford Life & Accident Ins. Co.*, 64 F. Supp. 3d 1198 (N.D. Ill. 2014).

[2] The levels of the SVP scale are described here: http://www.occupationalinfo.com/appendxc_1.html

18

think that she also overstated the experience required to perform that job. This possibility becomes even more acute once the bias that Aetna injected into her analysis is taken into account.

Aetna ordered Ms. Hamilton's vocational report when Mr. Bishop appealed his termination and cited it in the March 27 Letter. [AR 187.] Yet, Aetna failed to even acknowledge the contrary findings in Dr. Barnes's vocational report, which Mr. Bishop submitted with his appeal. Aetna's reliance on Ms. Hamilton's highly suspect report to deny Mr. Bishop's appeal shows that it failed to engage in principled reasoning throughout the entire claim process.

## IV.   CONCLUSION

Aetna's final decision to terminate Mr. Bishop's benefits was the result of an arbitrary and capricious process. Taken together, the flaws identified in Aetna's analysis warrant reversal of its termination.

Throughout its Response, Aetna relies very heavily on the "or may reasonably become" language in the Plan Test of Disability to justify its termination of benefits. However, at no point in the administrative record, including in its letters to Mr. Bishop, did Aetna explicitly state its reliance on that language. This strongly suggests to the Court that Aetna did not actually rely on that language when it terminated Mr. Bishop's benefits, but manufactured the argument after-the-fact to shore up its decision for litigation. At the very least, Aetna failed to apprise Mr. Bishop of its almost complete reliance on the "or may reasonably become" language and its belief that Mr. Bishop could secure other jobs by completing additional training. This prevented Mr. Bishop from presenting evidence that he could not reasonably complete any necessary training. The Court cannot conclude that Aetna's decision was part of a principled, reasoned process when it completely failed to articulate its purported rationale.

19

Aetna's handling of the vocational analyses in this case is even more concerning. First, Aetna misstated the results of the Seeker Report. Instead of considering whether Mr. Bishop could "reasonably become" qualified for the "potential" jobs stated in the report, Aetna incorrectly stated that Mr. Bishop possessed the skills to perform the four jobs and terminated his benefits. Then, when Aetna ordered Ms. Hamilton's report, it provided her with an inappropriately limited selection of Mr. Bishop's records. The records Aetna gave Ms. Hamilton each concluded that Mr. Bishop was able to find work, which aligned with Aetna's financial interest in terminating Mr. Bishop's appeal. In sum, Aetna's decision to terminate Mr. Bishop's benefits, which hinged upon him being able to acquire a job, was not properly supported by a reliable vocational report and is not the product of a principled and deliberative reasoning process.

Mr. Bishop is not "clearly entitled" to benefits under the terms of the LTD plan because several records state that he is able to perform sedentary work and it is uncertain whether he "may reasonably become" able to secure a reasonable occupation. *Elliott v. Metro. Life Ins. Co.,* 473 F.3d 613, 622 (6th Cir. 2006). Therefore, the Court declines to reinstate his benefits.  The proper remedy in this case is to remand Mr. Bishop's claim for a full and fair evaluation consistent with the concerns expressed in this opinion. *Id.*

Aetna would be well advised to utilize a vocational expert – who is given a full record – to determine whether there are sedentary jobs that Mr. Bishop can perform even with the various limitations on his physical capacity, notably the possibility that he will miss work due to gout flare up. If such jobs exist, Aetna should specifically state whether it believes Mr. Bishop is currently qualified to perform those jobs, or whether he will need additional education and/or training to qualify for them. Consistent with the "or may reasonably become" language, Aetna should explain why it believes Mr. Bishop could

20

reasonably be expected to complete any required training or education, again considering his physical limitations.

In short, Aetna improperly terminated Mr. Bishop's benefits. It is incumbent on Aetna to conduct its analysis of Mr. Bishop's claim in an acceptable manner. Accordingly, the Court **HEREBY ORDERS** that Aetna's decision to terminate benefits is **REVERSED** and **REMANDED** for further consideration consistent with the reasoning of this opinion.

Dated February 12, 2016.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY